STATE v. ELMER DAVIS, JR.

(Filed 12 October, 1960.)

**1. Criminal Law § 71—**

Confessions of a defendant are competent in evidence when, and only when, they are in fact voluntarily made.

**2. Same—**

Evidence upon the *voir dire* to the effect that the officers advised defendant that he need not answer questions and need not make any statements, that if he did they might be used against him, that defendant was not threatened or mistreated in any way, that his sole request to communicate with any person was granted, *is held* substantial and competent evidence sufficient to support the court's finding that the confessions made by defendant were voluntary.

**3. Same—**

The voluntariness of a confession is to be determined in a preliminary inquiry before the trial judge upon evidence adduced, and the determination of the trial court is conclusive on appeal if supported by competent evidence.

**4. Homicide § 20—**

In this prosecution for murder committed in the perpetration of the felony of rape, the confession of defendant together with evidence of other numerous facts tending to establish the *corpus dclicti* and the presence of defendant at the scene of the crime at the time it was perpetrated, *is held* sufficient to be submitted to the jury, and defendant's motion to dismiss was properly denied.

STATE *v.* DAVIS.

**5. Constitutional Law §§ 1, 30—**

   The State Court, in the discharge of its duty to protect defendant's rights, is governed by the State decisions in interpreting the State Constitution and law, but is governed by the decisions of the Supreme Court of the United States in interpreting defendant's rights under the Fourteenth Amendment to the Federal Constitution.

**6. Constitutional Law § 30:   Criminal Law § 71—**

   The admission in evidence of voluntary confessions made by defendant while he was being questioned by officers of the law after his apprehension and arrest as an escaped convict, even though 16 days elapsed between his apprehension and the filing of a murder charge against him and his arraignment thereon, does not violate the Due Process Clause of the Federal Constitution, since under the federal decisions the rule denying the admission in evidence of confessions obtained before prompt arraignment is a rule of evidence adopted for the federal courts and is not a constitutional limitation on the states.

**7. Constitutional Law § 30:   Arrest and Bail § 7—**

   The fact that a notation that defendant was not to þe allowed to see or call anyone is copied on the arrest sheet from a memorandum on an envelope made by the arresting officer, does not establish a violation of defendant's right under the Due Process Clause when the undisputed evidence is to the effect that no officer had the right to enter any such order, that it was not enforced, and that the sole request of defendant to communicate with any person was granted, since in such instance the notation is nothing more than an unauthorized and unenforced entry made by the arresting officer.

**8. Arrest and Bail § 3—**

   An officer of the law has authority to apprehend and arrest an escaped convict.

**9. Prisons § 2—**

   Where an escaped convict has been apprehended by municipal police officers who notify the Director of Prisons, the Director has authority to designate the place of imprisonment, and he may authorize the officers to hold the prisoner pending their investigation of crimes committed while the prisoner was at large.

**10. Indictment and Warrant § 1—**

   The object of a preliminary hearing is to inquire into the legality of the arrest and detention and to effect a release for one who is held in violation of law, and the rule that a defendant is entitled to a prompt hearing upon his arrest can have no application where the defendant is in lawful custody as an apprehended escapee from the State's prison.

**11. Constitutional Law § 30:   Criminal Law § 71—**

   The rule that the trial court's findings supporting its determination as to the voluntariness of defendant's confession are conclusive when supported by competent evidence and that review upon appeal is restricted to the undisputed facts, obtains in the federal courts in de-

termining whether there has been a violation of defendant's rights under the Due Process Clause of the Fourteenth Amendment.

**12. Criminal Law § 94—**

Where the record discloses that defense counsel made repeated interruptions during the testimony of a State's witness, the trial court may properly command counsel to sit down and permit the witness to complete his answer without interruption, and the court's further comment that "this is not a Roman circus" does not amount to an expression of opinion by the court as to the facts in the case.

**13. Homicide § 13: Indictment and Warrant § 17—**

Where the indictment charges murder committed in the perpetration of the specific felony of rape, the State must make out its case in conformity with the indictment and must prove that defendant killed deceased in the perpetration of or attempt to perpetrate that particular felony in order to justify a verdict of murder in the first degree.

**14. Homicide § 23—**

Where the indictment charges murder while perpetrating the crime of rape, an instruction to the effect that the jury must be satisfied from the evidence beyond a reasonable doubt that defendant caused the death of deceased while perpetrating or attempting to perpetrate that particular felony, and that otherwise the jury should return a verdict of not guilty, is not unfavorable to defendant, and the court is not required to give further instructions requested by defendant to the effect that defendant could not be convicted if the jury found he killed deceased while perpetrating another and distinct felony.

APPEAL by defendant from *Campbell, J.,* at the December 7, 1959, Regular Criminal Term, MECKLENBURG Superior Court.

Criminal prosecution upon the following bill of indictment:

"STATE OF NORTH CAROLINA    IN THE SUPERIOR COURT
MECKLENBURG COUNTY                      NOV. 2d TERM, 1959

"The jurors for the State upon their oath present that: Elmer Davis, Jr., late of the County of Mecklenburg, on the 20th day of September, 1959, with force and arms, at and in the County aforesaid did unlawfully, willfully, feloniously while perpetrating felony, to-wit; rape, kill and murder Foy Bell Cooper against the form of the statute and in such case made and provided and against the peace and dignity of the State.

"James E. Walker, Solicitor."

The Grand Jury returned the foregoing a TRUE BILL.

Upon arraignment the defendant, through counsel of his own selection, entered a plea of not guilty. A jury trial began on December 14, 1959.

The State offered evidence tending to show the following: At about two o'clock on Sunday afternoon, September 20, 1959, the deceased, Mrs. Foy Bell Cooper, an elderly lady, was seen to enter Elmwood Cemetery located on Seventh Street and near the railroad tracks in the city of Charlotte. At the time, she was carrying a handbag and a newspaper. Elmwood is a cemetery maintained for the burial of white people. Adjoining is Pinewood Cemetery, maintained for the burial of colored people. Separating the two is a wire fence along which trees, vines, and shrubbery form a hedge.

The deceased had been, for many years, in the habit of visiting her mother's grave located in the Elmwood Cemetery a few feet from the fence and hedge separating it from Pinewood. Near the mother's grave was a stone bench where Mrs. Cooper was accustomed to sit during her stay in the cemetery. About 25 or 30 feet from this bench and near the hedge was a large tombstone (3½ feet high and 6½ feet wide) marking the Nivens burial plot. Across the fence and hedge from the Nivens plot and at the foot of the hill in the Pinewood Cemetery was located the Jones mausoleum. This mausoleum had a heavy wooden door composed of four panels. The lower right-hand panel had been broken out or removed.

At about five o'clock on Sunday afternoon, September 20, some white and colored boys playing in the cemeteries looked through the open panel in the door of the mausoleum and discovered the body of Mrs. Foy Bell Cooper. They notified the police who called the coroner. The police made an intensive search of the premises, found a ladies' hairnet behind the Nivens monument, a pair of torn ladies' panties between the monument and the mausoleum, and Mrs. Cooper's handbag (wrapped in a newspaper) and her glasses hidden in the hedge.

The coroner, admitted to be a medical expert specializing in pathology, performed an autopsy, testified that Mrs. Cooper had been dead an hour or two when he saw her body, about five o'clock in the afternoon. "It is my opinion she died from strangulation. . . . In her vagina I found spermatozoa, . . . the lining was rather red. This would indicate that she had an intercourse."

At 11:00 o'clock p.m. on September 21, the defendant, Elmer Davis, Jr., was arrested by police officers in Belmont, a town in Gaston County located about 12 miles from Charlotte. At the time of the arrest, Davis was an escapee from a prison camp near Asheville where he was serving sentences of 17-25 years for robbery and assault with intent to commit rape. These offenses had been committed within two blocks of Elmwood Cemetery. The escape, his fourth dur-

ing this and prior terms of imprisonment, took place some time between September 1st and the 20th.

At the time of arrest he was wearing a pair of reddish brown shoes and dark clothing different from his prison uniform. He had in his possession a shoe box containing several pairs of ladies' panties and he carried one soiled pair in his pocket. He also had a billfold containing a social security card and blood donation receipts bearing the name Bishel Buren Hayes. The Belmont officers surrendered the prisoner to Lt. Gilleland, Holmburg and Porter, members of the Charlotte police force, who placed him in the City Jail and notified the State prison director of the arrest. The director authorized them to hold Davis pending their investigations.

The officers first interrogated the prisoner about his escape, the clothing he was wearing, the ladies' panties, and the billfold and contents. He said he "obtained" the articles of clothing between Canton and Asheville after his escape. He said a railroad bum gave him the billfold and contents. The police officers, with the prisoner's consent, took him to Asheville and Canton but he was unable to point out where he had stolen any of the articles.

On October 2, for the first time, the officers questioned the prisoner about the death of Mrs. Cooper. He denied any knowledge of her death or that he had been near the cemetery since his escape. As the officers picked up additional information they continued their questioning. Lt. Sykes, who had been on vacation until the 5th of October, interrogated the prisoner for the first time on October 6. At the beginning of the interrogation Officers Hucks and Festerman were present. The prisoner, in reply to a question, stated he would like to talk to Lt. Sykes alone. Hucks and Festerman left the room.

The State sought to have Lt. Sykes testify as to the statements made by the prisoner. Upon objection and request for preliminary investigation to determine whether the statements were voluntary, the court proceeded to hear evidence in the absence of the jury.

The defendant testified, in substance, he neither knew about nor had anything to do with Mrs. Cooper's death. He did not make the confession and did not understand the writing he signed contained the admissions on Page 1. If he did make any admissions of guilt they were induced by fear and threats of violence, by solitary confinement without opportunity to confer with relatives, and without proper food; that he signed some paper not because he was guilty, but in order to get out of the city jail where he could get better food and a hot bath; that his food in jail was limited to two meals per day consisting of two sandwiches only, and that he was hungry.

On cross-examination he admitted a long criminal record and at least four escapes while serving prison sentences. When arrested he was out on his second escape while serving current sentences.

The prisoner introduced the police department's record of his arrest. It contained this notation: "Date: 9/21/59. Hold for Hucks & Festerman, Re-Mrs. Cooper. Escapee from Haywood County still has 15 years to pull. Do not allow anyone to see Davis. Or allow him to use the telephone." A police officer testified that the notation was taken from a memorandum on the back of an envelope turned in by the arresting officers, copied on the arrest sheet, and the envelope destroyed. The Chief of Police testified no one had authority to make such an order. Captain McCall testified it was not enforced; that the prisoner made the request that he would like to see his sister. He does not claim to have made any other request. The police searched for and found the sister who visited him in jail and was permitted to do so in private.

The officers testified the prisoner was served the same food as other prisoners in the city jail. They testified that at no time was the prisoner threatened or mistreated in any way; that no promises or inducements were made to him, and he was told that he was neither required to answer questions nor to make a statement unless he wanted to; and that any statement he did make "might be used for or against him in a court of law." These statements were repeated in the paper which the defendant signed.

On the day following the signing of the confession, Dr. J. S. Nathaniel Tross, a minister, publisher of the Charlotte Post, author of a radio program, and a former pastor of a church in Belmont which the prisoner and his family attended, visited the prisoner in jail and had a private interview with him and prayer service. The visit lasted a full hour. Dr. Tross testified: "He told me Lt. Sykes prayed with him; that he enjoyed it and had faith in it. . . . The first question I asked him were the officers taking good care of him and his answer was yes. I asked him specifically about having not been fed properly and he said he was well taken care of."

At the conclusion of the preliminary investigation Judge Campbell ruled the signed statement and the oral admissions to the officers were voluntary. The jury was recalled, the written confession and the oral admissions to Officer Hucks and other police officers were admitted in evidence over the defendant's objection.

The details of the admissions made by the prisoner need not be repeated here. In addition to the confession and before it was writ-

ten and signed, and before the oral admissions to Detective Hucks, the prisoner went voluntarily to the cemetery with the officers and there showed them where he crossed the hedge, slipped up behind Mrs. Cooper, seized and choked her, dragged her behind the Nivens monument and there committed a crime against nature and rape. He said he saw someone in the cemetery and hid behind a bush, then carried the body to the Jones "little house," pushed it through the broken panel in the door, returned to the place of assault, wrapped up Mrs. Cooper's pocketbook in the paper she was sitting on, hid them and her glasses in the hedge.

According to his further story, he left the cemetery and just outside he came upon a man in a drunken stupor, took from him his billfold, shoes and socks; stole some other clothes from a clothesline near the railroad, changed into them and hid his discarded clothes and his convict shoes. He took the officers to the spot and without difficulty found the discarded clothes, including his shoes.

The State called as a witness John Shannon, a school boy 18 years of age, who testified in substance that he went to Elmwood Cemetery at about 2:00 or 2:15 on the afternoon of September 20 for the purpose of picking up his father and mother. He saw them in the cemetery and about the time he got out of his car he saw a colored man hide behind a bush near the stone bench. After seeing an account of Mrs. Cooper's death in the paper next morning he reported to the police having seen a colored man hiding in the hedge. He was unable to identify the prisoner as the man he saw; that he had recently moved to Charlotte from Syracuse, New York, where there were very few negroes, and that it was difficult for him to tell one from another. "Most of them look alike to me."

The State called Bishel Buren Hayes, a resident of South Carolina, who testified he was in Charlotte near a cemetery (he now knows to be Elmwood) on September 20; that he met up with an acquaintance. They drank some liquor and while his friend went in search of more liquor he went to sleep. When he awoke his shoes and socks, billfold and contents were gone. He identified as his these articles which were taken from the prisoner at the time of his arrest.

At the conclusion of the State's case the defendant moved for dismissal or judgment of nonsuit, and excepted to the court's refusal to grant the motion. While the defendant offered evidence before the trial judge on the question whether his confessions were voluntary, he did not offer evidence before the jury.

In apt time the defendant requested the court to give the jury

special instructions. The court refused to charge as requested. The defendant excepted. The jury returned for its verdict, "Guilty of murder in the first degree." From the judgment of death in the manner prescribed by law, the defendant appealed.

*T. W. Bruton, Attorney General and Harry W. McGalliard, Assistant Attorney General for the State.*
*Charles V. Bell, W. B. Nivens for defendant, appellant.*

HIGGINS, J. Counsel for the prisoner contend the trial court committed five prejudicial errors: (1) Holding the confessions voluntary and permitting the State to offer them in evidence. (2) Overruling defendant's motion to dismiss. (3) Failing to set aside the judgment upon the ground the confessions were involuntary and obtained and offered in evidence in violation of the prisoner's rights under the Due Process Clause of the Fourteenth Amendment. (4) Ordering counsel for the prisoner to sit down and reminding him the trial is not a Roman circus. (5) Denying prisoner's timely request for special instructions.

The first three errors assigned in reality present one question: Were the prisoner's admissions to the officers voluntary? If voluntary, as the term is defined by our Court, they were admissible in evidence. As stated by *Henderson, J.,* in *State v. Roberts,* 12 N.C. 259, "Confessions are either voluntary or involuntary. They are called voluntary when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him, . . ."

In the case of *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d, 572, *Justice Ervin* collected and analyzed our leading authorities on confessions. We quote one paragraph from his opinion:

"An extrajudicial confession of guilt by an accused is admissible against him when, and only when, it was in fact voluntarily made. *S. v. Thompson,* 227 N.C. 19, 40 S.E. 2d, 620; *S. v. Moore,* 210 N.C. 686, 188 S.E. 421; *S. v. Anderson,* 208 N.C. 771, 182 S.E. 643. A confession is presumed to be voluntary, however, until the contrary appears. *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494; *S. v. Grier,* 203 N.C. 586, 166 S.E. 595; *S. v. Christy,* 170 N.C. 772, 87 S.E. 499. When the admissibility of a confession is challenged on the ground that it was induced by improper means, the trial judge is required to determine the question of

fact whether it was or was not voluntary before he permits it to go to the jury. *S. v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84; *S. v. Andrew,* 61 N.C. 205. In making this preliminary inquiry, the judge should afford both the prosecution and the defense a reasonable opportunity to present evidence in the absence of the jury showing the circumstances under which the confession was made. *S. v. Gibson,* 216 N.C. 535, 5 S.E. 2d 717; *S. v. Alston,* 215 N.C. 713, 3 S.E. 2d 11; *S. v. Smith,* 213 N.C. 299, 195 S.E. 819; *S. v. Blake,* 198 N.C. 547, 152 S.E. 632; *S. v. Whitener,* 191 N.C. 659, 132 S.E. 603. The admissibility of a confession is to be determined by the facts appearing in evidence when it is received or rejected, and not by the facts appearing in evidence at a later stage of the trial. *S. v. Richardson,* 216 N.C. 304, 4 S.E. 2d 852; *S. v. Alston, supra.* When the trial court finds upon a consideration of all the testimony offered on the preliminary inquiry that the confession was voluntarily made, his finding is not subject to review, if it is supported by any competent evidence. *S. v. Hairston,* 222 N.C. 455, 23 S.E. 2d 885; *S. v. Manning,* 221 N.C. 70, 18 S.E. 2d 821; *S. v. Alston, supra.* A confession is not rendered incompetent by the mere fact that the accused was under arrest or in jail or in the presence of armed officers at the time it was made. *S. v. Litteral, supra; S. v. Bennett,* 226 N.C. 82, 36 S.E. 2d 708; *S. v. Thompson,* 224 N.C. 661, 32 S.E. 2d 24; *S. v. Wagstaff,* 219 N.C. 15, 12 S.E. 2d 657."

Without repeating the testimony which is recited in the statement of facts, the trial court had the evidence of the officers that the prisoner was advised he need not make a statement; that if he did it might be used against him. These statements are repeated in the paper signed by him. The officers testified the prisoner had not been mistreated in any way; that he had the same food as other prisoners; that he did not ask to see or communicate with any person except his sister. This request was granted. On the day after the confession the prisoner told Dr. Tross, his former pastor — a member of his own race — that he had been well treated by the officers. Thus Judge Campbell had before him on the preliminary inquiry substantial and competent evidence upon which to base his finding the admissions of the prisoner were voluntary.

According to our practice the question whether a confession is voluntary is determined in a preliminary inquiry before the trial judge. He hears the evidence, observes the demeanor of the witnesses,

and resolves the question. The appellate court must accept the determination if it is supported by competent evidence. *State v. Fain,* 216 N.C. 157, 4 S.E. 2d 319; *State v. Whitener,* 191 N.C. 659, 132 S.E. 603; *State v. Andrew,* 61 N.C. 205.

The confession is corroborated in many essential particulars: By the findings of the pathologist; by John Shannon who saw a person hiding in the hedge near the Nivens monument as the prisoner told the officers he had done; by the police having previously found Mrs. Cooper's pocketbook (wrapped in a newspaper) and her glasses in the hedge where he said he had hidden them; by Bishel Buren Hayes who testified his shoes and socks, billfold and contents were stolen from him as the prisoner had admitted to the officers; by the fact the prisoner was able to take the officers to the bushes near the railroad track and recover his discarded clothing. The evidence was amply sufficient to make out a case of murder in the perpetration of the crime of rape. The motion to dismiss was properly denied.

The prisoner has urged that the trial court denied him his rights under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Of course, it is as much the duty of the State courts to protect the prisoner's rights under the Due Process Clause of the Fourteenth Amendment as it is to protect his rights under the State Constitution and State laws. There is this difference, however, as we understand it: We place our own interpretation on our State Constitution and laws; but we are required to accept the interpretation the Supreme Court of the United States has placed on the Due Process Clause. *Constantian v. Anson County,* 244 N.C. 221, 93 S.E. 2d 163; Constitution of North Carolina, Article I, Sections 3 and 5; *Norris v. Telegraph Co.,* 174 N.C. 92, 93 S.E. 465.

In support of their contention the trial court denied to the prisoner due process rights, they cite many cases in which confessions have been rejected when a prisoner has been held beyond the time when he should have been taken before a committing magistrate for preliminary hearing. Careful examination will disclose that confessions were rejected under a rule of evidence set up for trials in the Federal courts and not for violation of constitutional rights under the Due Process Clause.

In the case of *Brown v. Allen,* 344 U.S. 443 at p. 476, the Supreme Court of the United States said: "If the delay in the arraignment of petitioner was greater than that which might be tolerated in a federal criminal proceeding, due process was not violated. Under the leadership of this Court a rule has been adopted for federal courts,

that denies admission to confessions obtained before prompt arraign-. ment notwithstanding their voluntary character. *McNabb v. U. S.,* 318 U.S. 332; *Upshaw v. U. S.,* 335 U.S. 410. . . . This experiment has been made in an attempt to abolish the opportunities for coercion which prolonged detention without a hearing is said to enhance. But the federal rule does not arise from constitutional sources. The Court has repeatedly refused to convert this rule of evidence for federal courts into a constitutional limitation on the States. *Gallegos v. Nebraska,* 342 U.S. 55, 63-65. Mere detention and police examination in private of one in official state custody do not render involuntary the statements or confessions made by the person so detained."

The prisoner argues the notation on the arrest sheet that he is to be held for Hucks and Festerman re Mrs. Cooper and not allowed to see or call anyone was a violation of his Due Process rights by the police department. The undisputed evidence, however, is the notation was made by the arresting officer on an envelope at the time of arrest and copied on the arrest sheet at the time the prisoner was placed in jail. The undisputed evidence as testified to by the chief of police is that no one in the department had authority to enter any such memorandum or order. Likewise undisputed is the evidence of Captain McCall that the notation or order was not enforced. The prisoner asked to see his sister, whom the officers searched for, after some difficulty found, and delivered the prisoner's message. She appeared at the jail and Captain McCall admitted her to a private conference with the prisoner. In fact the prisoner does not even claim he requested or wanted to see any other person. The notation on the record, therefore, becomes nothing more than an unauthorized and unenforced entry made by the arresting officer at the time of the arrest. There is no question about the right of the officer to make the arrest. Even a private citizen of the State "shall have authority to apprehend any convict who may escape before the expiration of his term of imprisonment whether he be guilty of a felony or misdemeanor, and retain him in custody and deliver him to the State Prison Department." G.S. 148-40.

At all times after the arrest the defendant was the prisoner of the State under the custody and control of the Director of Prisons. G.S. 148-4. The Charlotte officers gave the director prompt notice that they had the prisoner in custody. The director might have ordered the prisoner's return to the State's prison, in which case the Charlotte officers would have been required to travel long distances in

order to question him. Instead, the director authorized that he be held until they completed their investigation. The arrangement was one of convenience. The place of imprisonment was properly left to the director. The prisoner's term as a State's prisoner began and continued to run from the time of his arrest.

In reviewing a trial court's decision holding a confession voluntary, Federal appellate courts follow our State rule and accept the findings of the trial court if suported by competent evidence. This holding is based upon the ground appellate courts are not tryers of the facts. In *Stroble v. California,* 343 U.S. 181, the Supreme Court of the United States said: "This Court has frequently stated that, when faced with the question whether there has been a violation of the Due Process Clause of the Fourteenth Amendment by the introduction of an involuntary confession, it must make an independent determination on the *undisputed* facts (emphasis added) . . . We adhere to that rule."

The rule is stated in another way in *Watts v. Indiana,* 338 U.S. 49: "In the application of so embracing a constitutional concept as 'due process,' it would be idle to expect at all times unanimity of views. Nevertheless, in all the cases that have come here during the last decade from the courts of the various states in which it was claimed that the admission of coerced confessions vitiated convictions for murder, there has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication."

The record on this appeal discloses the prisoner was arrested as an escapee with 15 years to serve. The State prison authorities authorized the Charlotte police to hold him in custody until they had completed their investigation into the suspicious character of some of the articles of clothing, ladies' panties, billfold and contents, etc. The officers first took him to Canton and Asheville where he was unable to identify the place where he claimed to have stolen these articles. The officers were searching especially for Bishel Buren Hayes whose social security, blood donation cards, etc., were in a billfold taken from the defendant. The prisoner's explanation that he got the billfold and contents from a railroad bum aroused suspicion. These matters were inquired into following the arrest. While it is fair to assume the prisoner from the first was a suspect in the *Cooper* case, he was not questioned about it until October 2. Four days later he confessed and the following day was specifically charged with the crime of murder. Counsel argue the prisoner's detention for 16 days

without filing the murder charge violated Due Process rights, citing *Ashcraft v. Tennessee,* 322 U.S. 143; *Snyder v. Massachusetts,* 291 U.S. 97; *Upshaw v. U. S.,* 335 U.S. 410. This, however, is not a case in which a prisoner was held without formal arraignment to determine the legality of his arrest or detention. It is a case in which the officers questioned the prisoner in lawful custody about crimes committed while he was at large as an escapee. Escape from a felony sentence is a felony. Larceny from the person is a felony.

The object of a preliminary hearing is to effect a release for one who is held in violation of his rights. Counsel's argument is answered by the Supreme Court of the United States in the case of *United States v. Carignan,* 342 U.S. 36: "So long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given. . . . We decline to extend the McNabb fixed rule of exclusion to statements to police or wardens concerning other crimes while persons are legally in detention on criminal charges."

The record fails to disclose any violation of the prisoner's rights under the Due Process Clause of the Fourteenth Amendment. His assignment of error with respect thereto is not sustained.

Likewise without merit is the assignment based on the court's command to counsel to sit down and permit the witness (Lt. Sykes) to complete his answer without interruption, and the comment by the court that "this is not a Roman circus." The trial court did not thus express any opinion as to the facts in the case. It may be noted that it is the practice of some superior court judges to require counsel to remain seated at the counsel table when examining witnesses in order to facilitate orderly procedure. The idea is to prevent counsel from approaching too closely to the witness, especially when charging the witness with improper conduct. The prior exchange of comments between counsel and the witness justified the order.

Finally, the prisoner contends he should be awarded a new trial for failure of the court to charge the jury: "If the evidence produced in the trial for this case has proven to you beyond a reasonable doubt that the defendant murdered the deceased in the perpetration of a felony 'crime against nature' and has failed to prove to you beyond a reasonable doubt that the deceased was murdered by the defendant in the perpetration of a felony 'rape,' then it would be your duty to return a verdict of not guilty."

The bill of indictment as drawn required the State to satisfy the jury by the evidence beyond a reasonable doubt that the prisoner

murdered Foy Bell Cooper in the perpetration or attempt to perpetrate the crime of rape in order to justify a verdict guilty of murder in the first degree.

Ordinarily the State is better advised if the bill of indictment is drawn in the form approved by this Court in *State v. Kirksey,* 227 N.C. 445, 42 S.E. 2d 613. When the bill is drawn as thus approved, the State may make out a case of murder in the first degree by satisfying the jury from the evidence beyond a reasonable doubt the murder was "perpetrated by means of poison, lying in wait, imprisonment, starvation, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony." G.S. 14-17. By specifically alleging the offense was committed in the perpetration of rape the State confines itself to that allegation in order to show murder in the first degree. Without a specific allegation, the State may show murder by any of the means embraced in the statute.

In the charge as given, to which no exception was taken, the court defined all essential elements of the offense charged, properly placed upon the State the burden of satisfying the jury "from the evidence and beyond a reasonable doubt the defendant on September 20, 1959, while perpetrating the crime of rape, as that term has been defined to you, or while attempting to perpetrate the crime of rape, as that term has been defined to you, upon one Mrs. Foy Bell Cooper, the defendant caused her death, that then it would be your duty to return a verdict of guilty." Then follows the charge as to the verdict of guilty with a recommendation that the punishment be for life in the State's prison. . . . "In conclusion, the court again instructs you that in this case, depending on how you find the facts to be, bearing in mind the defendant has no burden of proof, the burden of proof remaining at all times upon the State of North Carolina, to satisfy you from the evidence and beyond a reasonable doubt as to each and every element necessary to constitute the guilt of the defendant before you may enter any verdict of guilty, and you may return either one of three verdicts in this case; first, the verdict of guilty of murder in the first degree, . . . or 2, guilty of murder in the first degree with a recommendation of life imprisonment, . . . or, 3, you may return a verdict of not guilty."

The charge placed upon the State the burden of proving murder in the commission, or attempt to commit rape; otherwise the court instructed the jury to return a verdict of not guilty. The charge certainly was not unfavorable to the prisoner.

In view of the gravity of the verdict and judgment, we have not only reviewed all assignments of error, the reasons given and authorities cited in support, but in addition we have examined the record proper. In the trial we find

No error.